## East St. Louis and St. L. Electric St. Ry. Co. v. Frederic Wachtel, Adm'r.

63  181
77  466
77  469
63  181
102  ¹325

1. INSTRUCTIONS—*Stating What Facts Constitute Negligence.*—An instruction which tells the jury, as a matter of law, that certain facts constitute negligence, is erroneous.

2. TROLLEY CARS—*Frightening Horses.*—The law does not imply that the driver of horses is in peril merely because the horses are frightened by a trolley car. In the absence of manifestations other than mere fright the fair presumption is that the driver will be able to control them.

182    APPELLATE COURTS OF ILLINOIS.

VOL. 63.]   E. St. L. & St. L. Electric St. Ry. Co. v. Wachtel.

But if the manifestations are such as to show the motorman that the driver is in peril, it is his duty to do what he reasonably can to relieve him.

3. SAME—*Risks of the Driver of Horses.*---The law imposes a duty upon persons in charge of trolley cars to give certain signals under certain circumstances, and the driver of horses going into the presence of such cars takes the ordinary risk of being able to control his horses.

4. SAME—*Duty of the Driver of Horses.*—It is the duty of the driver of horses in the presence of trolley cars to have ordinary appliances for controlling his horses if frightened and to be in a reasonably suitable position to use such appliances.

5. SAME—*When the Company is not Liable.*—If horses become frightened at trolley cars and run away because of weak and insufficient lines to hold them, the company operating the trolley can not be held liable for damages done by such horses, nor can it be liable if the driver is so situated that he can not exert the ordinary force to sustain them.

Trespass on the Case.—Death from negligence. Appeal from the Circuit Court of St. Clair County; the Hon. ALONZO S. WILDERMAN, Judge, presiding. Heard in this court at the August term, 1895. Reversed and remanded. Opinion filed March 7, 1896.

MESSICK & RHOADS, attorneys for appellant; JOHN W. NOBLE, counsel.

B. H. CANBY and W. J. MOYERS, attorneys for appellee.

MR. JUSTICE SAMPLE DELIVERED THE OPINION OF THE COURT.

The appellee recovered a judgment for $5,000 damages on a declaration averring in substance that his intestate was killed by the negligence of a motorman of appellant in sounding the gong of his car in such a negligent and unnecessary manner as to frighten a team of horses that was at the time passing along the track beside said car, whereby said team was caused to run away and run into the buggy in which appellee's intestate was at the time riding.

The evidence in brief shows that the deceased, in company with another person, had just passed over the bridge that spans the Mississippi river; that behind him another team, being driven by a young man by the name of Kempf, was also passing over said bridge, from the west to the east, and

as the team had reached about the top of the east approach a street trolley car came up beside the team, going in the same direction, and the motorman sounded the gong, whereupon the team increased its speed, pranced some, one of the horses being in a lope and the other trotting, when the driver in some way fell out on the tongue or double-trees of the wagon, and the horses thus being released of control, ran away and into the buggy of deceased, as above stated. The appellee claims the gong was continued to be sounded after the motorman saw, or might have seen, the horses were frightened. This is denied by appellant. Kempf testified that his team was twelve years old; that he had been driving them into St. Louis on an average of twice or three times a week for three years, and, as understood, over this bridge; that " it was a gentle team; they never got frightened at a street car before;" and had passed street cars on the bridge and approach. He had some furniture loaded in his wagon, and says, " I was sitting on a bureau or little wash-stand. I was standing in the wagon close to the end gate, the front end gate." His feet, as he says, were " on the inside of the wagon, at the front end gate." He says the motorman " rang the bell when he came up close to the wagon." " It made my horses get scared and made them run away. The car got ahead of me after about 100 yards; when it pitched me off the wagon the car was ahead then; I laid on the tongue and held the horses, but I could not hold them." He says, " the horses pulled me over the end gate onto the tongue, then they started running away when they had me on the tongue. When that (car) was aside of me one (horse) was trotting and the other was in a lope."

The watchman of the bridge testified that he saw the horses going too fast, and he started across the bridge to check them, but desisted because the driver got them under control; but that he then jerked them, and as he did so, slid off onto the tongue; that his feet were hanging outside the front end gate when he slid off, and, as he claims, stood on the tongue or doubletrees, trying to hold the horses, but failed to do so; that he did not lose control of them until

184      APPELLATE COURTS OF ILLINOIS.

VOL. 63.]   E. St. L. & St. L. Electric St. Ry. Co. v. Wachtel.

after he had slid off, or onto the tongue. There is other evidence on the respective sides, but this is particularly referred to for the purpose of considering the instructions of the court given to the jury, on which error is assigned.

The court prepared the instructions and told the jury, among other things, that the motorman had the right and it was his duty to sound the gong to give notice of the approach of his car, although the wagon was not on the railway track, and that he had a right to assume such sounding of the gong would not frighten the team.

" 8.   But while this is so, it was his duty to be watchful so as to exercise ordinary care in the operation of his car, and in running his car to look out and see whether teams are being thereby frightened, so as not to put in danger the person in charge of such team, or other persons who were rightfully and lawfully using the bridge approach, and if he saw, or by the exercise of ordinary care ought to have seen, that a team of horses in front of him on the approach was frightened at the noise of his car, or at the sound of his gong, so as to endanger its driver, or other persons on said approach, then it was his duty to do what he reasonably could in the management of his car to diminish the fright of his team, and if it was necessary to accomplish that purpose, then he should stop the sound of his gong, or even stop the car itself.

" 9.   You will therefore determine from the evidence whether there was one of defendant's cars there and whether the motorman on defendant's said electric car on the north side of the approach of the bridge across this river at East St. Louis, behind the team of horses being driven by one William Kempf, sounded the gong of his car, and whether the said team became frightened at that noise; also whether said motorman saw, or by the exercise of ordinary care ought to have seen, that said team was being frightened thereby, and whether he continued to sound said gong after he saw, or ought to have seen, said team was so frightened, and whether in consequence thereof said team became unmanageable and ran into the buggy in which the de-

ceased, Burgdorf, was riding, and thereby so injured said Burgdorf that he died, and also whether said motorman in continuing to sound said gong failed to exercise ordinary care for the safety of the driver and said Burgdorf, and whether the injury to Burgdorf was the natural and ordinary consequence of such failure. If you so find, and also find that said Burgdorf was, at the time he was so injured, and immediately before, exercising ordinary care for his own safety, and that he left as next of kin the persons named in the declaration, and that they sustained pecuniary loss by reason of his death, then you should find for the plaintiff."

These instructions are principally criticised as invading the province of the jury in telling them what acts or omissions would constitute negligence, and as limiting the care of the motorman to that particular team. There are also other criticisms.

The instructions were carefully prepared and are evidently based on the language of the opinions in cases of Benjamin v. H. St. Ry. Co. and Ellis v. L. & B. Ry. Co., 160 Mass. pp. 3, 341. The eighth instruction tells the jury, as a matter of law, what it was necessary for the motorman to do in this case, with the necessary implication that if he did not do so, then he was guilty of negligence; that is, if he saw the team was frightened, so as to endanger the driver or other person, then, if necessary, he should stop sounding the gong, or even stop the car itself.

In Penn Co. v. Frana, 112 Ill. p. 404, the court instructed the jury that " It is the duty of a person before attempting to cross a railway track, to stop, if necessary, and look and listen for the approach of trains, before entering upon such track." The court say, " It is no doubt true that it is the duty of a person about to cross a railroad track, to approach cautiously, etc., but it is always a question of fact for the jury to determine from the evidence, whether the person injured has exercised proper care and caution, and not a question of law." The instruction was held to be bad. In Myers v. I. & St. L. Ry. Co., 113 Ill. 386, it is said, after re-

186     APPELLATE COURTS OF ILLINOIS.

VOL. 63.]   E. St. L. & St. L. Electric St. Ry. Co. v. Wachtel.

viewing the authorities, "Under the ruling in the cases cited, an instruction which tells the jury, as a matter of law, that certain facts constitute negligence, is erroneous." In the case of North Chicago St. R. R. Co. v. Williams, 140 Ill. 275, an instruction was held to be erroneous which told the jury it was negligence to attempt to get on a street car while in motion. In telling the jury, as a matter of law, what the duty of the motorman was, under the facts of this particular case, was, as stated in the Frana case, *supra*, an invasion of the province of the jury. To say that, under a certain state of facts, a duty to do a certain thing was imposed by law, is equivalent to saying, if that certain thing is not done then there was negligence. The evidence shows in this case, the car was even, alongside the team, after it came up, and it may be that other conditions existed requiring the sounding of the gong or continuous movement of the car, or that, by going ahead, the car would soon pass the team, which, as is generally known, allays fright. At least under the repeated decisions of our courts, the particular things that should have been done or omitted, in order to exercise proper care, usually are, and were in this case, facts, for the determination of the jury, and not law, for the determination of the court.

The ninth instruction seems to make liability depend upon whether the motorman saw, or might have seen, that the team was frightened by the sound of the gong; from which, considered in connection with the duty imposed by the eighth instruction, the jury might conclude that in such case it was his duty to stop sounding the gong, or stop the car itself, although, being so frightened, the team was at the time under control, if thereafter it became unmanageable and ran away. As stated in the Ellis case, *supra*, horses usually become frightened at trolley cars, until carefully trained, and in that case mere fright of horses is not made the ground for imposing the duty suggested, but it is where the fright is such and fear manifested in such a way as to show the motorman that the driver of the horses is in peril. If it is the duty to stop cars, or stop sounding the gong every time

a horse is frightened by the cars, then the use of them would be impracticable. N. C. St. R. R. Co. v. Harms, 59 Ill. App. 375. But the law does not imply the driver of the horse is in peril merely because the horse is frightened by the trolley car. On the contrary, in the absence of manifestations other than mere fright, the fair presumption is that the driver will be able to control the horse, for the reason, the duty being imposed by law to give the signal, the driver of the team, going into the presence of such cars, takes the ordinary risk of being able to do so. Of course, if as stated in the Massachusetts cases, the manifestation of fright is such as to show the motorman the driver is in peril, then he should do what he reasonably can to relieve him. It is the duty of the driver to have such ordinary appliances, and be in a reasonably suitable position to control his horses, if frightened. If the horse should be frightened at such cars and run away because of weak and insufficient lines to hold him, it would not be contended the company would be liable, nor would it be if the driver was so situated that he could not exert the ordinary force to restrain him, for the reason, in such cases, the primary negligence would be the driver's. This element is entirely omitted from these instructions. It is especially important, in view of the fact, clearly shown by the evidence, that the team was under control until the driver fell out of the wagon, which, let it be observed, was after the car had passed beyond the team.

Kempf, the driver, says, "When that (car) was aside of me one (horse) was trotting and the other was in a lope." This shows the team was under control and did not indicate the driver was then in peril. "The horses pulled me over the end gate onto the tongue; then they started running away. When it pitched me off the wagon the car was ahead then." He does not explain how he was pulled over the end gate while the horses were still attached to the wagon, and they continued to be attached until after he fell on the bridge and the wagon had struck the buggy in which deceased was riding, which was some distance further on. The defendant's witnesses say his feet were hanging

· over the end gate, and when he jerked on the horses he slid down on the tongue. He says his feet were on the inside. However this may be, it is evident, while the horses were attached to the wagon and his feet were inside he could not be pulled out on the tongue by holding to the lines. There is no evidence he was jolted out by the wagon striking an obstruction, nor is there any evidence to show that the motorman could reasonably anticipate he would be placed in such a perilous and helpless position by anything that was occurring.

The judgment is reversed and the cause is remanded.